Mr. Justice Wylie,
after stating the case, delivered the opinion of the court:
There appears one very serious defect in the title of the defendants upon the face of the record, a defect which was not brought to our attention upon the argument.
The decree for sale of the property was passed on the 14th of February, 3863, and after adjudging in favor of the complainants’ claim, and requiring its payment on or before the first of April thereafter, in default whereof the property in question should be sold, it appointed the trustee in such default to make the sale, and then proceeded to prescribe the terms and manner of the sale. Among these terms is contained the following: “And on the ratification of such sale, and on the payment of the whole purchase-money, and not before, the said trustee, by a good and sufficient deed to be executed and acknowledged agreeably to law, shall convey to the purchaser of said property the interest of said defendant therein, free, clear, and discharged of all claim of the parties to this cause, and of any person or persons claiming by, from, or under them.”
Now, it appears by the record that the sale made by Trustee Scrivener, in this case, has never been confirmed and ratified by the court, and hence, according to the express language of the decree, the trustee who succeeded Scrivener had no authority to make a deed to the purchaser. On 7th of November, 1863, the court ordered that the sale in question should be ratified and confirmed “ unless cause to the contrary thereof be shown on or before the first Tuesday of February next; provided a copy of this order be inserted in *213 the Morning Chronicle, a newspaper printed in the city of Washington, once in each of three successive weeks before the first day of January next.”
Here was an order out of the usual form and course in such cases. It was dated 7th of November, 1863, provided for the publication of notice in each of three successive weeks before the first day of January, and then, should no cause to the contrary be shown, for final ratification, not until the first Tuesday of February, three months from the date of the order.
Without resorting to conjecture as to the reasons which may have had influence on the mind of the court for its caution in making the order in these terms — a caution which the character of the sale, and the absence of the party interested, in a time of war, might well have suggested — the plain fact appears on the face of the record, that no publication of the required notice was ever made in the Morning Chronicle, nor was any application ever made to the court to have the sale in question ratified and confirmed.
Had such application been made it might have been the duty of the court, of its own motion, to refuse to confirm a sale of property which in 1861 had been assessed for taxes at a valuation of nearly 02,000, where the sale was for 0449.13, payable in currency greatly depreciated, and where the terms of payment where so easy to the purchaser as they were in this case, and where the debt to be paid was only 0100 and interest.
Unless the sale be ratified by the court the purchaser acquires no estate in consequence of his bid, or the payment of the purchase-money, nor has the trustee authority to make him a deed. (See Alexander’s Ch. Pr., 146; 2 Daniels’s Ch. Pr., 1454.)
Nor does this record show any act whatever on the part of the court which could be construed into ratification of the sale in question, even by implication. It has never so much as passed an order for the distribution of the fund produced by the sale.
It was gross laches, therefore, on the part of these defendants, or their advisers, not to discover an essential defect *214 such as this, apparent on the very face of their title, and on themselves the law imposes the consequences.
We have thus far assumed that the parties complainant in this case are bound by the decree against the defendant Slocum, notwithstanding he was dead at the time it was passed, and such we consider the law to be. It was not the case of a personal decree, made against a party over whom the court had no jurisdiction; but a decree for the sale of real property, under the jurisdiction of the court, for the payment of a debt due by the ancestor of these complainants, through whom they claim, and which was secured by the lien of a deed of trust upon the property in question.
In Grignor’s Lessee vs. Astor, 2 How. R., 338, Baldwin J., in opinion for the court says: “In cases in personam, where there are adverse parties, the court must have power over the subject-matter and the parties; but on a proceeding to sell the real estate of an indebted intestate, there are no adversary parties, the proceeding is in rem, the administrator represents the laud. (S. and R., 432.) They are analogous to proceedings in the admiralty, where the only question of jurisdiction is the power of the court over the thing, the subject-matter before them, without regard to the persons who have an interest in it.” We admit that this authority is not directly in point for the present case, except so far as to establish the jurisdiction of the court. Undoubtedly it is erroneous to make a decree against a man after his death, or to dispose of property under such a decree, after it has descended to his heirs, unless they have been made parties to the suit; but such a decree would not be void, for the subject-matter of the decree was within the jurisdiction. Notice by publication in such a case is proper as to non-resident parties, and in most cases is not required by the law. But of itself, no publication to non-residents can confer jurisdiction over them, nor can even personal service of notice through the mail, or by means of an agent, and a decree founded on such a notice would be absolutely void. But if the subject of suit be property lying under the jurisdiction of the court, a decree after such notice would bind the property. It would not be binding personally upon non-residents, but only in respect of their interest in the property. The notice then, of itself, is of none effect on the question of juris *215 diction. If there be no property there is no jurisdiction. It is the subject-matter, then, alone which is the ground of jurisdiction. And where a statute requires notice to non-residents to be given, by publication, and a judgment or decree is passed affecting the property subject to the jurisdiction of the court, without the publication of the required notice, the decree or judgment, though erroneous, is not void; for of itself, notice to non-residents contributes nothing to the court’s jurisdiction. A purchaser at a sale under such a decree or judgment would take a valid title, although the decree or judgment might afterwards be reversed for its errors in a higher court, and notwithstanding the errors of the court might be palpable upon the record. (See Voorhees vs. Bank of United States, 10 Peters, 449, in addition to Grignor's Lessee vs. Astor, already referred to.)
So far, therefore, as this case involves the jurisdiction of the court to make a decree for the sale of the property in question, we are of opinion that such jurisdiction did belong to it; and a purchaser bona fide, for value, would have taken a good title. The difficulty with the case of the defendants, in this respect, is that no sale was ever ratified by the court, and the trustee made the deed to the purchaser in disregard of the express restriction of the decree that he should make no deed except after the ratification of the sale by the court.
Nevertheless, we are not disposed, under the circumstances of the case, to allow the complainants to enter into the fruits of other men’s labors, or to reap where they have not sown. In 1861, Slocum, their ancestor, was here holding an office under the Government, had purchased the lot in question, and had a clear title to it. He was a native of Mississippi, and a friend of the gentleman at the head of the Interior Department, where he was employed. The lot was at that time assessed for about $2,000. He mortgaged it for a loan of $100, to enable him to reach his friends, and left the District, after the civil war had in fact broken out in that part of the country “ where he would be.” He died during the war; the debt for which he had given security upon his lot was overdue and not paid. It was not known whether he was living or dead, or, if dead, who were his heirs; nor was it lawful or practicable to ascertain these facts. Nor was it *216 possible to foresee the duration of the war, or its'effect upon property in this District. A bill was filed by the creditor, Mr. Cramer, with a view to enforce his lien, by procuring a judicial sale of the property for the satisfaction of his claim. The usual notice by publication was given to Slocum, as a non-resident, and in due time a decree by default was entered directing a sale of the property and making appointment of a trustee for that purpose. This trustee (or his duly-appointed successor) did make a sale of the property to J. Gray Jewell; and on payment of the whole of the purchase-money, made him a deed for it. The price paid by Jewell was very inadequate, but he thought, no doubt, that he was getting a valid title, at a low price. Shaw, the trustee, made his deed to Jewell, in pursuance of the sale, November 24,1864; consideration, $449.13. Jewell divided the lot into three parts; • one he sold to Prather on the 6th January, 1866, for $1,194.13; one other to Francis Miller, 12th of same month and year, for $1,147.80; and the other part to George Miller, January 2,1866, $1,147.80; in all, $3,489.73. The deeds made to these purchasers contain covenants of general warranty, and their aggregate amount of purchase-money is $3,489.73. At the time of these purchases the lot was wholly unimproved. Before making their respective purchases from Jewell, each of these defendants, George Miller, Francis Miller, and Leonard B. Prather, had the title examined by counsel, generally reputed to be competent, and they were advised that the title was valid. One of these gentlemen enjoys a very high reputation as an examiner of titles in this District. He expressed the opinion that, being a title under a chancery decree, it was good. Houses have been built, and other improvements made by these purchasers on their respective subdivisions of the lot in question, to the value of many thousands of dollars, expended by them in good faith, and in reliance upon the judgment of well-known experts on questions of title. Besides this, the war closed in the spring of 1865, and thereafter there was no obstruction to delay the plaintiffs from immediately looking after their interests in this District. At that time Jewell, the purchaser, claimed the title under the sale, but had expended nothing in improvements, and had paid but $449.13 for the property; $257.80 was yet in the hands of the trustee, where it still is; and this was the state of mat *217 ters till early in January, 1866, when Jewell sold to the two Millers and to Prather their several parts of the lot. Had these parties made their appearance within six or even eight months after the close of the war, and made proper application to the court, the sale would have been instantly set aside, without loss or injury and but small inconvenience to any party. This laches on their part continued till the bill was filed in the present suit, which was in January, 1873, nearly eight years after the war had closed, these purchasers all the time expending their money and increasing their improvements, believing themselves secure, because a lawyer had told them it was a good chancery title.
To permit complainants to redeem under these circumstances, without allowing for the improvements, would be to aid them, in spite of their own laches, to commit a fraud upon men who had expended their money in good faith, under a title which counsel learned in the law had advised them was good, and which to the unlearned seemed to be good. Fortunately for the justice of the case, the court, having been invoked for its assistance, is at liberty to extend its assistance upon such terms as will do no injustice. Under no circumstances will a court of equity allow itself to be made an instrument of wrong. Bather than lend itself to such a cause it will refuse to interfere, and leave the parties to their remedy at law; and if that would result in a fraud upon the defendant, it will interpose on his behalf.
Although a mortgagee is not entitled generally to any allowance for his improvements, (Moore vs. Cable, 1 Johns. Ch. R., 385,) yet such allowance may be made under special circumstances, as when the mortgagee has acted in good faith, and under a mistaken impression that the right of redemption has been finally barred, as was held in Benedict vs. Gilman, 4 Paige’s R., 58, and Westmore vs. Roberts, 10 How. Pr. R., 51; or when the mortgagor has been slow to act, if not guilty of laches, and has thus led to a false impression by his silence, although he may have been ignorant of the circumstances which would have made it his duty to speak. (Mickle vs. Dillaye.) In commenting on the case of Moore vs. Cable, Chancellor Kent says, “ Lasting improvements in building have been allowed in England under peculiar circumstances, and they have been sometimes *218 allowed in this country and sometimes disallowed,” (4 Com. 167;) and in a note at the same place it is further said that “all the cases agree that the mortgagee is to be allowed the expense of repairs, and beyond that the rule is not inflexible, but it is subject to the discretion of the court, regulated by the justice and equity arising out of the particular circumstances of each case.” In Hilliard on Mortgages the author says, “The rule refusing the allowance of lasting improvements has been subjected to some exceptions in special cases, as where the mortgagee makes such improvements supposing himself to be the absolute owner;” and in Neal vs. Hythorp, 3 Bland Ch. R., 590, the chancellor says, “ If the mortgagee have been long in possession, claiming adversely, and suffered to treat the estate as his own, and the mortgagor stands by and permits lasting improvements to be made, he shall pay for them.”
On the like principle of justice is grounded the doctrine that where the mortgagor subsequently borrows more money from the mortgagee on bond, and dies, the heir shall not redeem without paying both debts.
We are of opinion that, in cases like the present, the pend-ency of the war could not affect the rights of a bona-fide purchaser at a judicial sale, especially when the record does not disclose the status of the mortgagor to be that of a public enemy; since, as we have seen, the sale would be valid if the court had jurisdiction over the matter. But, according to the view we take of the case, it has become unnecessary to go into that question at all.
As to the tax-title in the defendants, and which the complainants seek to have removed on tbe ground that' it is a cloud upon their title, we feel obliged to remit that controversy to be tried by jury at the circuit. The irregularities set out in complainants’ bill, showing a neglect or violation of certain provisions contained in the ordinances of the corporation by its officers, as to the time and mode of making out the assessment-lists, making entries in. the book, &c., are not of the kind to affect the validity of such a sale., A tax-sale is good if it corresponds exactly, in all particulars, with the act of Congress on the subject, although the officers may have neglected to fulfill certain requirements in regard thereto prescribed by ordinances of the corporation. That *219 was determined by the Supreme Court in tbe case of Thompson vs. Lessee of Carroll, 22 How., 422.
On the other hand, the record furnishes no evidence to enable us to determine on behalf of the defendants that their tax-title is a good one. A tax-deed of itself is no evidence of title. It is absolutely waste paper until the holder under it has shown that all the preliminary steps required by law have been strictly complied with. “The deed is not the title itself, nor even evidence of it. Its recitals bind no one. It creates no estoppel upon the former owner. No presumption arises upon the mere production of the deed that the facts it professes to set out had any existence.” Blackwell on Tax T., 430.
In the present case we have before us no evidence to show that the tax-deed in question is either good or bad.
Should that tax-title, however, be a valid one, it will put an end to present controversy. It is true that denfendants have filed no cross-bill in this cause, setting up a title under the tax-deed to Jewell, although in their answers to the allegations of the bill which avers that it .is void they do insist that it is a valid title and one under which they claim.
It would be useless, considering this aspect of the controversy, to pass a decree allowing the complainants to redeem on the terms we have indicated, for if they were to redeem by paying defendants for their improvements, leaving open the controversy under the tax-sale, they might in the end lose all should it turn out that the defendants had a valid title under that sale.
It will be necessary, therefore, to retain the cause for the present, and until an issue can be made up and tried at law whether that tax-title be valid or otherwise; and in that issue the defendants here should be the plaintiffs, as on them it will lie to make out the affirmative.
Should the result prove favorable to the defendants in this cause, the bill in the present case will have to be dismissed. Should it be otherwise the redemption sought for by the complainants in this cause can be obtained on the terms we have already indicated.
Mr. Justice MacArthur did not sit in this case, and Mr. Justice Olin did not take part in the decision.