Ronald COOLEY, Plaintiff,

v.

UNITED STATES, Defendant.

No. 06–284C.

United States Court of Federal Claims.

May 25, 2007.

Ronald Cooley, pro se, Philadelphia, PA.

Michael N. O'Connell, Jr., Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Mr. Ronald Cooley claims that the United States breached an implied-in-fact contract that allegedly arose when Mr. Cooley's employer, the Social Security Administration ("SSA"), adopted suggestions that he made through the agency's Employee Suggestion Program ("ESP"). Among other things, Mr. Cooley challenges a decision of the Director of the Office of Personnel Management ("OPM") in October 2005 to reject the SSA Commissioner's request that OPM approve for forwarding to the President a recommendation for an award of $32,819 for Mr. Cooley's suggestions. The suggestions were made in 1994, 1999, and 2000, and related to an SSA computer system that screens beneficiaries of the need-based program of Social Supplemental Security Income for the Aged, Blind, and Disabled, to ensure that they have met their statutory obligation to apply for any benefits for which they are eligible under another benefits program, that for Federal Old–Age, Survivors, and Disability Insurance. Two of Mr. Cooley's suggestions were adopted by SSA between 1997 to 2002, and a third was adopted in 2002. For his suggestions, SSA granted Mr. Cooley two cash awards of $1,300 and $24,450 and recommended him for a third—the $32,819 award rejected by OPM.[1]

The government has moved to dismiss Mr. Cooley's complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), arguing that this court lacks subject matter jurisdiction over Mr. Cooley's claims and that, in the alternative, Mr. Cooley has failed to state a claim upon which relief could be granted. In short, the government argues that Mr. Cooley has no statutory entitlement to an award greater than $25,000. This court held a hearing on the government's motion on April 3, 2007. As a consequence of that hearing, the court requested that Mr. Cooley file a supplemental submission to delineate his contentions. Mr. Cooley then filed a cross-motion for remand and provided additional materials, including correspondence and communications with and within SSA. The government responded on May 10, 2007, in essence acquiescing in Mr. Cooley's cross-motion to remand, subject to limitations. With this supplementation in hand, the case is now ready for disposition, and for the reasons set forth below, the court vacates OPM's rejection of the SSA Commissioner's request for favorable action on an enhanced award and grants Mr. Cooley's motion to remand to SSA for further proceedings in accord with this decision.

**FACTS**

Pursuant to 5 U.S.C. §§ 4501–4513, SSA administers an ESP under which employees may be granted awards for providing suggestions that SSA adopts. Compl., Ex. 2 (SSA

---

1. Mr. Cooley is an energetic federal employee who has previously received awards for other suggestions that were adopted by the SSA. *See, e.g., Cooley v. United States*, 1997 WL 325846, at *1 (E.D.Pa. June 10, 1997) (relating to an award for corrective measures to address "a perceived flaw in the payroll deduction system of [the Department of Health and Human Services] regarding the tax withholding from supplemental wage or incentive payments to employees.").

Personnel Manual For Supervisors) ("SSA Personnel Manual"), Subchapter 3 at 2, 15. The SSA Personnel Manual details the procedures for submitting and evaluating a suggestion, granting awards, and seeking reconsideration of SSA's decision respecting an employee's suggestion. *Id.*, Ex. 2 (SSA Personnel Manual), Subchapter 3 at 9–12, 15–17, 19. Awards may include cash awards, which are based on the tangible savings or intangible benefits that result from a suggestion, and the manual includes a specific monetary scale of awards for levels of tangible savings and intangible benefits. *Id.*, Ex. 2 (SSA Personnel Manual) Subchapter 3 at 15, 27–28. Mr. Cooley made his suggestions under the auspices of the ESP program.

## A. KZ Diary Suggestion

On December 20, 1994, Mr. Cooley submitted to SSA on Form HHS–170 an official employee suggestion ("KZ diary suggestion").[2] Compl., Ex. 1 (Form HHS–170) at 7–8. Mr. Cooley's suggestion, assigned Suggestion No. 9501003, was intended to remedy certain programming errors in the SSA mainframe computer system pertaining to eligibility determinations for the program that provides Social Supplemental Security Income for the Aged, Blind, and Disabled ("SSI" or "Title XVI"). *See id.* ¶ 11, Ex. 1 (Form HHS–170) at 7, 9–11; Social Security Act, Pub.L. No. 74–271, §§ 201, 1601, 1602, 49 Stat. 620 (Aug. 14, 1935) (codified as amended at 42 U.S.C. §§ 401, 1381, 1381a). The SSI program is need-based. *See* 42 U.S.C. § 1382. Eligibility is determined by an individual's income and resources and is subject to a statutory requirement that the

individual, if eligible for benefits under the program of Federal Old–Age, Survivors, and Disability Insurance ("OASDI" or "Title II"), must apply for those benefits. 42 U.S.C. §§ 1382(a), (e)(2), 1382a(a)(2)(B).[3] Title II benefits would decrease or perhaps even eliminate an individual's benefits under the SSI program. *See* 42 U.S.C. §§ 1382(a), 1382a(a)(2)(B).

SSA's mainframe computer system employed the so-called KZ diary system to identify SSI beneficiaries who were eligible for Title II benefits. Compl. ¶ 12, Ex. 1 (Form HHS–170) at 9.[4] Mr. Cooley's suggestion recommended four "related, . . . [but] independent[ ]," solutions to two problems with the KZ diary system: (1) the system failed to identify SSI beneficiaries who became eligible for Title II benefits *after* their initial application—for example, because they had reached the age of 62 or had met the prerequisites for earnings history under the Title II program, and (2) the system was not designed to detect previous erroneous determinations by SSA—made at the time of an SSI beneficiary's initial application—that the beneficiary was ineligible for Title II benefits. *Id.* ¶ 12, Ex. 1 (Form HHS–170) at 9–10; 42 U.S.C. § 402(a)(2), 414(a). In his KZ diary suggestion, Mr. Cooley noted the benefits his suggestion would bring to the government—improved compliance with statutory requirements, increased benefits for eligible Title II recipients, and a reduction in the SSI rolls. Compl., Ex. 1 (Form HHS–170) at 12.

SSA rejected the KZ diary suggestion on July 10, 1995, Compl. ¶ 14; Pl.'s Cross–Mot. to Remand ("Pl.'s Cross–Mot."), Ex. 1 at 10–

---

2. Form HHS–170 was used by the U.S. Department of Health and Human Services, of which SSA was an organizational subcomponent, until March 1995, when SSA became an independent agency. *See* Compl., Ex. 1 at 7–8; Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, §§ 101, 105, 110, 108 Stat. 1464, 1465, 1472–74, 1490.

3. The requirement that an individual seeking SSI benefits must apply for any Title II benefits to which he or she is entitled is found in two related provisions of Title XVI of the Social Security Act. Under 42 U.S.C. § 1382(e)(2),

> No person shall be an eligible individual or eligible spouse for purposes of [Title XVI] if, after notice to such person by the Commission-

er of Social Security that it is likely that such person is eligible for any payments of the type enumerated in section [1382a(a)(2)(B) of this title], such person fails within 30 days to take all appropriate steps to apply for and (if eligible) obtain any such payments.

The payments "enumerated in section [1382a(a)(2)(B) of Title 42]" are those "received as an annuity, pension, retirement, or disability benefit, including . . . old-age, survivors[ ] and *disability insurance benefits.*" 42 U.S.C. § 1382a(a)(2)(B).

4. The KZ diary system places a "diary" on an SSI beneficiary's record, alerting the "servicing field office" that the beneficiary might be eligible for Title II benefits. Pl.'s Cross–Mot. at 6.

12 (Letter from Grant Sheehan, SSA, Director, Division of Assistance Program Posteligibility Quality, to Cooley (July 10, 1995)),[5] and Mr. Cooley sought formal reconsideration of that decision on May 23, 1996. *Id.*, Ex. 1 at 1–2 (Mem. from Cooley to Central Suggestion Team (May 23, 1996)). Mr. Cooley's suggestion was rejected on reconsideration, *id.*, Ex. 1 at 119–120 (Mem. from Dan Bergerson, SSA, Chief, Payment Quality Branch, Division of Payment Policy, Office of Program Benefits Policy, to Cooley (Sept. 17, 1996)), and again rejected on further review. *Id.*, Ex. 1 at 121–23 (Letter from Bergerson to Cooley (Jan. 23, 1997)). Ultimately, however, on November 12, 1997, SSA adopted a portion of the KZ diary suggestion—Mr. Cooley's recommended changes to the KZ diary system that would *prospectively* identify SSI beneficiaries who were eligible for Title II benefits. *See id.* at 11–12 & Ex. 1 at 93–95 (E-mail from Bergerson to Bonnie Beard (July 15, 1997)), 103–104 (Letter from Wilbert C. Bostic, SSA, Team Leader, Central Suggestion Team, to Cooley (Jan. 15, 1998)); Compl., Ex. 1 (Form HHS–170) at 11.

SSA, nonetheless, refused to grant Mr. Cooley a cash award, contending that his suggestion fell within his job responsibilities. *See* Pl.'s Cross–Mot., Ex. 1 at 102–104 (Letter from Bostic to Cooley (Jan. 15, 1998)); *see also* Compl., Ex. 2 (SSA Personnel Manual) at 15 (explaining that awards are not "[n]ormally granted" for suggestions that fall within the suggester's job responsibilities). On February 6, 1998, Mr. Cooley requested reconsideration of the denial of a cash award, asserting that (1) the position description on which the SSA's decision was partially based was incorrect and that the KZ diary sugges-

tion was not within his normal duties, (2) his supervisors had prohibited him "from working on the [suggestion] as a job duty," (3) SSA had on numerous occasions rejected his suggestion, and (4) he had done "virtually all the work … on [his] own time and outside the workplace." Pl.'s Cross–Mot., Ex. 1 at 107–08 (Mem. from Cooley to Bostic (Feb. 6, 1998)).[6] On April 21, 1998, SSA reversed itself, granting Mr. Cooley a $1,300 award. *Id.*, Ex. 1 at 129–31 (Letter from Bostic to Cooley (undated)).

On June 6, 1998, Mr. Cooley requested reconsideration of the amount of the $1,300 award, asserting that (1) the portion of the KZ diary suggestion that SSA had adopted had generated both tangible and intangible benefits—$634,000 in savings in the first year of the suggestion's implementation and the identification of tens of thousands of additional SSI beneficiaries, and (2) based on the SSA Personnel Manual guidelines for cash awards under the ESP, he was entitled to an award of between $7,550 and more than $25,000. *See* Pl.'s Cross–Mot., Ex. 1 at 133–39 (Mem. from Cooley to Bostic (June 6, 1998)). On August 3, 2001, Mr. Larry Massanari, SSA's Acting Commissioner, notified Mr. Cooley that the agency had sought approval from OPM to grant him an additional award, citing a requirement that OPM approve awards exceeding $10,000. *Id.*, Ex. 1 at 308–09 (Letter from Larry G. Massanari, SSA, Acting Comm'r to Cooley (Aug. 3, 2001)). In July or August 2001, Mr. Cooley received an award of $24,450, over and above the earlier award of $1,300. *See* Compl. ¶ 19; Pl.'s Cross–Mot. at 12.[7] SSA implemented the improvements included in the KZ diary suggestion beginning in January 2002, and by January 2005, SSA had identified an addi-

---

**5.** Attached to plaintiff's motion to remand is a single set of consecutively paginated exhibits. These pages will be treated collectively as part of "Exhibit 1" *(e.g.*, Ex. 1 at 22).

**6.** Regarding SSA's determination that the KZ diary suggestion had been within Mr. Cooley's job responsibilities, he wryly posed the following question to a colleague in an e-mail:

How can a project, done on the employee's own time, that management has decided is based on a fallacy, where the required work on

which is disapproved, and whose results are thought to have no potential use regardless of what they might show, be considered part of the employee's job responsibilities?

Pl.'s Cross–Mot., Ex. 1 at 105–06 (E-mail from Cooley to Robert Horan, SSA (Feb. 2, 1998)).

**7.** It appears that the $24,450 award, although nominally in response to Mr. Cooley's request for reconsideration of the KZ diary suggestion that SSA adopted, *see* Pl.'s Cross–Mot., Ex. 1 at 133–39 (Mem. from Cooley to Bostic (June 6, 1998)), instead was based on two other suggestions that

tional 24,500 individuals as eligible for Title II benefits. *Id.* at 12.

### B. False–Alerts Suggestion

On March 26, 1999, Mr. Cooley formally submitted to SSA another suggestion, which SSA assigned Suggestion No. 9900806. Pl.'s Cross–Mot., Ex. 1 at 164 (Letter from Bostic to Cooley (Mar. 31, 1999)).[8] This suggestion (the "false-alerts suggestion") attempted to remedy a separate problem with the KZ diary system—identification of certain SSI beneficiaries as eligible for Title II benefits, when in fact they were not eligible. *See id.* at 14; Hr'g Tr. 47:5–23 (Apr. 3, 2007).[9] SSA initially confused the false-alerts suggestion with yet a further suggestion that Mr. Cooley sent by facsimile to the responsible SSA office on the same day and appears not to have formally considered the false-alerts suggestion separately. *See* Pl.'s Cross–Mot. at 15–16 & Ex. 1 at 373 (E-mail from LaVerne Holland, SSA, to Cooley (Jan. 18, 2007)).[10] Nonetheless, in the course of responding to a memorandum from SSA's Central Suggestion Team regarding Mr. Cooley's request for reconsideration of the $1,300 award for the *KZ diary suggestion* (Suggestion No. 9501003), SSA's Office of Quality Assurance—with Mr. Cooley's concurrence—recommended that the award take into account the false-alerts suggestion. *Id.* at 16 & Ex. 1 at 182 (E-mail from Neuman Bankert, SSA, to Zowney (June 30, 1999)), 186–190 (Facsimile from Ellen Lesniewski, SSA, to Cooley (Aug. 24, 1999)), 193–94 (E-mail from Cooley to Lesniewski (Aug. 26, 1999)).[11] The record

does not reveal SSA's precise rationale for the $24,450 award Mr. Cooley received in July or August 2001—nominally granted for Mr. Cooley's KZ diary suggestion. SSA may have folded the false alerts-suggestion into the single award of $24,450. *Id.*, Ex. 1 at 308–09 (Letter from Massanari to Cooley (Aug. 3, 2001)) (not specifically mentioning the false-alerts suggestion); *see also id.* at 12 (arguing that the $24,450 award was based, in part, on the false-alerts suggestion).[12]

### C. Special Disability Project Suggestion

Among the recommendations that Mr. Cooley included in his 1994 suggestion dealing with the KZ diary system (Suggestion No. 9501003) were (1) a suggestion to identify *prospectively* those SSI beneficiaries who were eligible for Title II benefits, and (2) two suggestions aimed at identifying *retrospectively* the *backlog* of SSI recipients who had been eligible for Title II benefits at the time of their initial SSI application, but whom SSA had erroneously excluded from consideration for those Title II benefits. Compl., Ex. 1 (Form HHS170) at 10–11; Pl.'s Cross–Mot. at 18–19 (noting that the backlog proposal was contained in Items 12(A) and 12(C) of Form HHS–170 for Suggestion No. 9501003).[13] When SSA eventually accepted the prospective portion of the KZ diary suggestion, the agency "tabled" Mr. Cooley's backlog proposal. Pl.'s Cross–Mot. at 11–12, Ex. 1 at 95 (E-mail from Bergerson to Beard (July 15, 1997)).

Persisting, in 1999 Mr. Cooley began to develop his own software as a means of

---

Mr. Cooley had made. *See infra*, at 553 & 557–58.

8. SSA alternatively referred to suggestion numbers as control numbers. *Compare* Pl.'s Cross–Mot., Ex. 1 at 164 (Letter from Bostic to Cooley (Mar. 31, 1999)), *with id.*, Ex. 1 at 165 (Mem. from Bostic to Cooley (June 25, 1999)).

9. Mr. Cooley had informally notified SSA of the false-alerts problem in November 1998. Pl.'s Cross–Mot., Ex. 1 at 144–45 (E-mail from Cooley to Bob Zowney, SSA (Nov. 19, 1998)).

10. By January 2007, SSA had "closed" the false-alerts suggestion, and Mr. Cooley was informed that the agency no longer had a copy of his original suggestion. Pl.'s Cross–Mot. at 16, Ex. 1 at 373 (E-mail from Holland to Cooley (Jan. 18, 2007)).

11. Mr. Cooley states that he realized that the false-alerts suggestion from March 1999 had been mistakenly "patched together with th[e KZ diary] suggestion," but, as he explained: "I didn't complain because I thought, well, I'm getting credit for it." Hr'g Tr. 33:18–23 (Apr. 3, 2007).

12. The $24,450 award nominally came in response to Mr. Cooley's request for reconsideration for the amount of the original $1,300 award. *See* Pl.'s Cross–Mot., Ex. 1 at 133–39 (Mem. from Cooley to Bostic (June 6, 1998)), 182 (E-mail from Bankert to Zowney (June 30, 1999)).

13. Although the 1994 suggestion included *two* suggestions relating to this backlog problem, Mr. Cooley appears to concede that these two suggestions actually constitute a single suggestion. Compl., Ex. 1 at 10–11 (Form HHS–170); Pl.'s Cross–Mot. at 18–19.

implementing his backlog suggestion ("Special Disability Project suggestion"). Compl. ¶ 16; Hr'g Tr. -51:5–7 (Apr. 3, 2007).[14] In March 2000, Mr. Cooley informally submitted a modified version of this Special Disability Project suggestion, and, by May 2000, SSA took steps to adopt the suggestion. Pl.'s Cross–Mot. at 18, Ex. 1 at 200–01 (E-mail from Cooley to Horan, Zowney (Mar. 23, 2000)), 203 (E-mail from Cooley to James Little, Phil Young, SSA (May 4, 2000)). Using software that he had developed, Mr. Cooley identified more than 130,000 SSI beneficiaries who were potentially eligible for disability insurance benefits under the Title II program. Compl. ¶ 17; Pl.'s Cross–Mot., Ex. 1 at 207 (E-mail from Cooley to Young, Little (May 10, 2000)), 315–16 (SSA Fact Sheet, Special Disability Workload) (undated).

As noted, Mr. Cooley had received a $24,450 award, nominally in response to his request for reconsideration of the $1,300 award for the KZ diary suggestion. *See* Pl.'s Cross–Mot., Ex. 1 at 93–95 (E-mail from Bergerson to Cooley (July 15, 1997)). Acting Commissioner Massanari's letter to Mr. Cooley on August 3, 2001 regarding that award cited not the portion of the KZ diary suggestion that SSA had adopted in November 1997, but the retrospective Special Disability Project suggestion based on Mr. Cooley's custom software. *Id.*, Ex. 1 at 308–09 (Letter from Larry G. Massanari, Acting Comm'r, SSA, to Cooley (Aug. 3, 2001)) (referring to the approximately "130,000 … SSI[ ] disability recipients who may be insured for Title II disability benefits"); *see also supra*, at 553 (noting that the $24,450 award might also have incorporated the false-alerts suggestion).

Having received the $24,450 award, Mr. Cooley then contended that the amount of the award did not adequately account for the benefits that the false-alerts and Special Disability Project suggestions had produced. Pl.'s Cross–Mot., Ex. 1 (E-mail from Cooley to Zowney (Aug. 16, 2001)) at 317–18. At that point, SSA's management recommended that Mr. Cooley prepare a formal request for reconsideration of the amount of the $24,450 award. *Id.*, Ex. 1 at 321 (E-mail from Horan to Cooley (Sept. 21, 2001)). On October 4, 2001, Mr. Cooley filed a request for reconsideration of the award amount of Suggestion No. 9501003, seeking an increased award and focusing on the Special Disability Project. *Id.*, Ex. 1 at 323 (request by Cooley for reconsideration of award amount (Oct. 4, 2001)). In support, Mr. Cooley noted that "much more data is now available which shows that the suggestion will result in other much greater tangible and intangible benefits to the government than originally calculated." *Id.*

On February 20, 2004, SSA Commissioner Jo Anne Barnhart forwarded to OPM for its approval a recommendation that Mr. Cooley be granted an award of $32,819. Compl. ¶ 23 & Ex. 1 at 2. Because of the amount involved, the recommendation was treated as "requir[ing] concurrence by the Office of Personnel Management and approval by the President." *Id.*, Ex. 1 at 2. The Form SSA 171 that Ms. Barnhart enclosed with the letter referred to Suggestion No. 9501003, the original suggestion that Mr. Cooley submitted in 1994, and indicated that the suggestion had been adopted on August 20, 2002. *Id.*, Ex. 1 at 3. Supporting documentation explaining the calculations SSA made to arrive at the $32,819 figure indicated that the award was based on the Special Disability Project and false-alerts suggestions. *Id.*, Ex. 1 at 5; Pl.'s Surreply at 9 (noting that lines 10–12 and footnote 3 of the supporting table pertain to the false-alerts suggestion and that lines 13–15 pertain to the Special Disability Project suggestion). SSA indicated that a total of $3,956,919.46 in tangible and intangible savings was being realized as a result of Mr. Cooley's suggestions. Compl. ¶ 29 & Ex. 1 at 5. On October 19, 2005, OPM Director Linda Springer sent a letter to Ms. Barnhart declining to approve the $32,819 award. Compl. ¶ 26, Ex. 6 at 1. Ms. Springer stated that OPM had "previously approved a total award amount of $24,450 for this suggestion in August 2001" and that "the

---

14. Mr. Cooley wrote the software without access to SSA's mainframe databases by using a standard desktop computer that employed Micro-soft's Visual Basic programming language and Access relational database management system. Hr'g Tr. 45:14–16, 51:22 to 52:5 (Apr. 3, 2007).

amounts already awarded [to Mr. Cooley] generally fall within the guidelines for recognizing even the recalculated savings the suggestion has produced." *Id.,* Ex. 6 at 1.

Mr. Cooley then filed the instant suit.

## STANDARDS FOR DECISION

The jurisdiction of a federal court must be established as a threshold matter before the court may proceed with the merits of any action. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see* RCFC 12(b)(1). In ruling on a motion to dismiss under RCFC 12(b)(1), the plaintiff bears the burden of proving that the court has jurisdiction over the subject matter of his complaint. *McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998). The court must construe the allegations of the complaint in the light most favorable to the plaintiff, *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated in part by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (abrogating aspects of *Scheuer* pertaining to the scope of qualified immunity of executive officials), and may consider "evidentiary matters outside the pleadings." *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985).

Granting a motion to dismiss under RCFC 12(b)(6) "is appropriate when the plaintiff can prove no set of facts that would warrant the requested relief, when drawing all well-pleaded factual inferences in favor of the complainant." *Levine v. United States,* 453 F.3d 1348, 1350 (Fed.Cir.2006). In ruling on a motion under RCFC 12(b)(6), the court must determine "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. A motion to dismiss should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## ANALYSIS

Under the Tucker Act, this court has "jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is jurisdictional and must be accompanied by a corresponding substantive claim "enforceable against the United States for money damages." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

Mr. Cooley alleges that he entered into an implied-in-fact contract with the United States that arose when the SSA adopted his suggestions for improvements in the agency's implementation of the SSI program, that SSA's consideration of cash awards for those adopted suggestions was governed by federal statutes and regulations, plus the SSA Personnel Manual, and that the provisions of the statutes, regulations, and manual supplied the terms of that contract. Compl. ¶¶ 6, 31. The government does not directly challenge that the United States entered into *some type* of implied-in-fact contract with Mr. Cooley; rather, it disputes jurisdiction on the narrower basis that the government did not enter into such a contract "for consideration in excess of $25,000 without OPM or presidential approval." Def.'s Mot. to Dismiss at 6. To address the parties' competing claims, the analysis that follows limns the basic premises of an implied-in-fact contract related to an employee suggestion adopted by a federal agency.

### A. An Implied–In–Fact Contract

In general terms, to establish an implied-in-fact contract with the United States, Mr. Cooley must show: (1) mutual intent of the parties to contract, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government representative who entered or ratified the agreement to bind the United States. *Schism v. United States,* 316 F.3d 1259, 1278 (Fed.Cir.2002); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990). To recover for breach of contract, Mr. Cooley must demonstrate: the existence of a valid

contract, a duty arising out of the contract, a breach of that duty, and damages caused by the breach. *San Carlos Irr. & Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.1989).

Cash awards for suggestions are governed by Section 4503 of Title 5, which provides that—

> [t]he head of an agency may pay a cash award to . . . an employee who—
>
>> (1) by his suggestion, invention, superior accomplishment, or other personal effort contributes to the efficiency, economy, or other improvement of Government operations or achieves a significant reduction in paperwork; or
>>
>> (2) performs a special act or service in the public interest in connection with or related to his official employment.

5 U.S.C. § 4503. The amount of incentive awards is capped by statute. An award by an agency may not exceed $10,000. 5 U.S.C. § 4502(a). However, "[w]hen the head of an agency certifies to the Office of Personnel Management that the suggestion . . . or other meritorious effort for which the award is proposed is highly exceptional and unusually outstanding, a cash award in excess of $10,000 but not in excess of $25,000 may be granted with the approval of the Office." 5 U.S.C. § 4502(b). Finally, "[a] Presidential award may be in addition to an agency award under section 4503." 5 U.S.C. § 4504.

The SSA Personnel Manual implements Section 4503 by setting out the conditions under which the agency will grant an employee a cash award for his or her suggestion and providing guidelines for determining the amount of any such award. Compl., Ex. 2 at 17–19, 22, 29–30 (SSA Personnel Manual).[15] Cash awards may be granted for employee suggestions upon "a. [a]doption of the suggestion in full or in part, or if the actual idea is not adopted but stimulates a better solution to an existing problem; and b. [m]anagement's commitment to implement; no suggestion is eligible for adoption unless it can and will be implemented." *Id.* at 17. The manual also provides that a suggestion adopted by SSA will *not* lead to a cash award when the suggestion was within the employee's job responsibilities or when the benefits from the suggestion were worth less than $1,000. *Id.* at 19. Finally, the manual includes specific monetary schedules for making cash awards based on the tangible savings and intangible benefits of the suggestion. *Id.* at 29–30.[16]

Prior decisions have examined statutes, including Section 4503 of Title 5, that provide that agencies "may" make cash awards under the sort of employee suggestion program at issue here. *See, e.g., Griffin v. United States,* 215 Ct.Cl. 710, 712, 1978 WL 5754 (1978) (analyzing 10 U.S.C. § 1124); *Martilla v. United States,* 118 Ct.Cl. 177, 181, 1950 WL 5040 (1950) (analyzing the former 5 U.S.C. § 116a); *Anderson v. United States,* 73 Fed.Cl. 199, 201 (2006) (analyzing 5 U.S.C. § 4503); *Rosano v. United States,* 9 Cl.Ct. 137, 144–45 (1985) (same). These cases hold that the permissive language of these statutes indicates that they are not, standing alone, money-mandating provisions that would flesh out the jurisdiction provided by the Tucker Act to state a claim cognizable in this court. *See Rosano,* 9 Cl.Ct. at 144–45; *McGee v. United States,* 5 Cl.Ct. 480, 481–82 (1984); *cf. Adair v. United States,* 227 Ct. Cl. 345, 648 F.2d 1318, 1322, 1324 (1981) (permissive language of statute gave agency discretion whether to grant plaintiffs incentive pay); *Contreras v. United States,* 64 Fed.Cl. 583, 597–98 (2005) (same).[17] Fur-

---

**15.** The version of the SSA Personnel Manual cited and provided by the parties was adopted August 22, 1994. Compl., Ex. 2. Chapter S451, Subchapter 3 of the manual sets out the Employee Suggestion Program. A subsequent addendum to that portion of the manual resulted from a memorandum of understanding dated January 25, 2002 between SSA and the American Federation of Government Employees. *Id.*

**16.** For example, for suggestions whose tangible benefits were up to $10,000, the award is to equal 10% of those benefits. Compl., Ex. 2 at 29 (SSA Personnel Manual). The tangible benefits monetary schedule also tracks the Title 5 restrictions on granting (1) awards of greater than $10,000, but not more than $25,000 and (2) awards greater than $25,000. *Compare* Compl., Ex. 2 at 29 (SSA Personnel Manual), *with* 5 U.S.C. §§ 4502(a)-(b), 4504.

**17.** By contrast, the moiety statute, 19 U.S.C. § 1619, under which the Secretary of the Treasury "may" make monetary awards to infor-

thermore, no implied-in-fact contract can arise if the agency fails to adopt an employee's suggestion. *See Anderson,* 73 Fed.Cl. at 201–02; *Rosano,* 9 Cl.Ct. at 144–45; *McGee,* 5 Cl.Ct. at 481–82.

As explained in *Anderson,* the legal framework governing the evaluation when an agency has adopted the employee's suggestion is somewhat murky, but generally starts with the premise that an implied-in-fact contract has been formed as a result of the agency's adoption of an employee's suggestion. *See Anderson,* 73 Fed.Cl. at 202–03. *Compare Griffin,* 215 Ct.Cl. at 714, (after the agency "accepted and acted on [the suggestion], . . . [it] bec[a]me bound by an implied contract"); *Ridenour v. United States,* 44 Fed.Cl. 202, 207 (1999) ("[T]he [suggestion] program is an invitation to submit offers which, if accepted by the agency, entitle the offeror to recognition that may include a cash award determined in accordance with published guidelines. . . . [The program] gives rise to enforceable expectations correctly described as an implied-in-fact contract."); *Cooley,* 1997 WL 325846, at *3 ("Cooley contends that once HHS adopted his suggestion and decided to award him money, an implied-in-fact contract arose, binding HHS to act in accordance with its own established procedures. I agree."), *with Shaller v. United States,* 202 Ct.Cl. 571, 596 (1973) ("The courts will not upset agency determinations [of incentive awards] except for a clear showing of abuse of discretion.") (no explicit finding of an implied-in-fact contract); *Serbin v. United States,* 168 Ct.Cl. 934, 1964 WL 1624 (1964) ("plaintiffs had failed adequately to allege clear abuse of discretion") (same); *Martilla,* 118 Ct.Cl. at 182 (agency has "considerable discretion" to evaluate an employee's suggestion, which must be "fairly considered") (same).[18]

In all events, adoption of a suggestion, or provision of information, or other actions taken in accord with and reliance upon agency procedures may give rise to an implied-in-fact contract that incorporates those internal procedures. *See Merrick v. United States,* 846 F.2d 725, 726 (Fed.Cir. 1988) (the I.R.S. "fixed the amount of the reward [for the informant] . . . by establishing [through a publication] how the IRS would calculate it"); *Griffin,* 215 Ct.Cl. at 714 ("[I]mplied contract . . . required [the head of the agency] to establish plaintiff's compensation without abuse of discretion and within the guidelines he had published, if there be any difference between these two concepts."); *Anderson,* 73 Fed.Cl. at 203 ("[A] contract must arise based upon an agency's procedures that hold out some prospect that an accepted suggestion will be met with an award.").

Viewed in the light most favorable to the plaintiff, *see Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683, and taking into account the supplemental submissions made by Mr. Cooley, *see Indium Corp.,* 781 F.2d at 884, this court determines that Mr. Cooley has established this court's jurisdiction over his claims based upon an implied-in-fact contract with the United States. *See* 28 U.S.C. § 1491(a); *Griffin,* 215 Ct.Cl. at 714; *Ridenour,* 44 Fed. Cl. at 207; *Cooley,* 1997 WL 325846, at *3. It is undisputed that SSA adopted three of the suggestions that Mr. Cooley made and that SSA endeavored to provide awards to Mr. Cooley for one or more of those suggestions. Based on these considerations, the government's motion to dismiss under RCFC 12(b)(1) and, alternatively under 12(b)(6), is denied. This court has jurisdiction to hear Mr. Cooley's claims.

### B. Mr. Cooley's Contractual Claims

As in *Anderson,* 73 Fed.Cl. at 204, this court need not reconcile the somewhat

mants, sets out sufficiently explicit conditions for its exercise that, despite the permissive verb, the Federal Circuit has deemed the statute to be money-mandating. *See Doe v. United States,* 100 F.3d 1576, 1581–82 (Fed.Cir.1996).

18. At least one court has suggested that an agency has unlimited discretion in deciding whether to grant an award for an adopted suggestion, but

that case involved a suggestion that the agency rejected, and the issue of whether an implied-in-fact contract was formed based upon relevant internal procedures did not arise. *Kempinski v. United States,* 164 Ct.Cl. 451, 452–53 (1964) ("He might pay [the award for the employee suggestion] or not, as he might consider the merits of the suggestion and other factors.").

murky body of case law associated with review of an agency's determination of the amount of an award for an adopted employee suggestion. Here, the issues before the court, particularly as narrowed by Mr. Cooley's cross-motion to remand and associated supplemental submission, and the government's response, are not at this stage focused on either (1) the discretion exercised by SSA in granting Mr. Cooley the two cash awards of $1,300 and $24,450 or by OPM in denying the request for a further Presidential award of $32,819, or (2) the precise amount of any additional award, if any, to which Mr. Cooley is entitled. Rather, the salient issue involves SSA's actions in treating Mr. Cooley's three suggestions as a single basis for an award.

In this case, SSA adopted three separate suggestions made by Mr. Cooley, but considered them collectively for purposes of an award. Each suggestion, as made by Mr. Cooley and as adopted by SSA, was a discrete proposal. As Mr. Cooley notes, he first received a $1,300 in 1998 for the KZ diary suggestion. On reconsideration for that award amount, he received a further award of $24,450 in 2001, not for the KZ diary suggestion, but for both the false-alerts suggestion and the SDP suggestion. See *supra*, at 553–54. Mr. Cooley also provided documentation that SSA's recommendation in 2004 for a Presidential award of $32,819 was based on a reconsideration of the $24,450 award, and reflected the false-alerts suggestion and the SDP suggestion. Compl., Ex. 1 at 5; Pl.'s Surreply at 9. In denying the $32,819 award, OPM Director Linda Springer also based her decision on the premise that OPM had "previously approved a total award amount of $24,450 *for this suggestion* in August 2001," Compl., Ex. 6 at 1 (emphasis added), leading ineluctably to the conclusion that OPM, too, had considered the false-alerts suggestion and the SDP suggestion as a single suggestion in 2001 and 2005.[19]

Accordingly, Mr. Cooley has established that both SSA and OPM made their decisions

about awards for his suggestions on the mistaken premise that only one suggestion was involved rather than three. Whether viewed as a breach of contract, an abuse of discretion, or both, SSA's and OPM's actions in this regard contravened the implied-in-fact contract with Mr. Cooley. Each of his three suggestions, separately submitted and separately adopted by SSA, should have been considered independently by SSA for purposes of determining an award. The question of an appropriate remedy thus arises.

## C. Remedy

■ Section 4503 of Title 5 grants to the SSA Commissioner, not this court, the authority to grant cash awards to employees for their suggestions. Mr. Cooley asks this court to remand this matter to SSA, and the government does not oppose that motion.[20] Under the Tucker Act, this court possesses "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2); *see also* RCFC 52.2(a)(1) ("on its own motion, the court may in any case within its jurisdiction by order remand appropriate matters to any administrative or executive body or official"). The Supreme Court has identified certain circumstances under which remand is appropriate:

> If the record before the agency does not support the agency action [or] if the agency has not considered all relevant factors ... the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *see also Diversified Maint. Sys., Inc. v. United States*, 74 Fed.Cl. 122, 127 (2006) ("the views expressed in Florida Power & Light reflect long-standing administrative

---

19. Presumably, OPM was unaware of the KZ diary suggestion, notwithstanding SSA's reference to the number for that suggestion in its request to OPM. *See* Compl., Ex. 1 at 2–4.

20. While the government states that it "does not object to a remand to [SSA] and [OPM]," it has not responded to the factual arguments put forward by Mr. Cooley in support of his motion. Def.'s Resp. to Pl.'s Cross–Mot. at 1.

practice and precedents"). In remanding a case to an agency, a court appropriately avoids invading the province of the agency and substituting the court's judgment for that of the agency. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105, 107, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction); *Knowledge Connections, Inc. v. United States*, 76 Fed.Cl. 6, 22 (2007); *see also Securities & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency."); 33 Charles Alan Wright & Charles H. Koch, Jr., *Federal Practice & Procedure* § 8312, at 82 (2006) ("Remand allows for correction while still maintaining the proper allocation of responsibilities between the courts and the agencies.").

In short, it is appropriate to remand this matter to SSA for a determination of the monetary awards, if any, due to Mr. Cooley.

### D. Terms of Remand

When remand is appropriate, the court has an obligation to provide the agency "with such direction as [the court] may deem proper and just." 28 U.S.C. § 1491(a)(2). RCFC 52.2(a)(2) states that "[a]n order of remand shall (A) delineate the area of further consideration or action deemed warranted on the remand, (B) fix the duration of the remand period, not to exceed 6 months, and (C) specify the extent to which court proceedings shall be stayed during the remand period."

On remand, SSA shall consider Mr. Cooley's three suggestions as separate sugges-

tions and shall determine the amount of the cash awards, if any, to which he is entitled for each suggestion.[21] By statute, SSA has independent authority to make an award of up to $10,000 to an employee for his suggestion, but for an award of more than $10,000, but not more than $25,000, SSA must first obtain OPM's approval. 5 U.S.C. § 4502(a)-(b); 5 C.F.R. §§ 451.106(b), 451.107(a). Employee awards in excess of $25,000, require presidential action. OPM must approve SSA's recommendation for such an award, and the President must give "final approval." 5 U.S.C. § 4504; 5 C.F.R. § 451.107(b). Applying this regime, SSA shall make individual determinations as to the amount of the award, if any, for each of Mr. Cooley's three suggestions and shall refer to OPM for approval any award exceeding $10,000. SSA shall make these determinations as a matter of first impression. It shall also consider those awards that have already been granted to Mr. Cooley, allocating these prior awards among the individual suggestions, and then reaching conclusions respecting any net further amounts due Mr. Cooley. OPM shall approve or disapprove any SSA recommendation for an award of more than $10,000, but not more than $25,000. For any awards recommended by SSA and approved by OPM that exceed $25,000, OPM shall seek final approval from the President.

SSA shall make the determinations contemplated by this remand within 180 days of the entry of this Opinion and Order. *See* RCFC 52.2(a)(2)(B). During the remand period, proceedings in this case shall be stayed. *See* RCFC 52.2(a)(2)(C). The court shall retain jurisdiction, and the proceedings on remand conducted by SSA, and if appropriate, OPM are subject to this court's review. *Knowledge Connections*, 76 Fed.Cl. at 22;

---

**21.** The government suggests that the remanded issues should include "(1) whether Mr. Cooley made the suggestions that he describes in his motion to remand [, and] (2) if so, whether the suggestions should be considered as one suggestion or more than one suggestion for purposes of determining whether he should be paid an additional incentive award or awards." Def.'s Resp. to Pl.'s Cross-Mot. at 1. These issues can be and have been resolved, however, on the basis of documentary materials presented to the court by the parties. The parties had a full and fair

opportunity to address these two topics in their supplemental submissions; indeed, the primary purpose of the supplemental proceedings was to flesh out the record respecting the suggestions made by Mr. Cooley to SSA that were encompassed by the SSA's award determinations at issue in the case. *See* Hr'g Tr. 59:20 to 74:20 (Apr. 3, 2007). Nonetheless, SSA may, if it wishes, reconsider these issues in light of any *new* evidentiary materials that might become available on remand.

*Christian v. United States,* 60 Fed.Cl. 550, 551 (2004).

## CONCLUSION

For the reasons set forth, the government's motion to dismiss is DENIED, and Mr. Cooley's motion to remand is GRANTED. OPM's decision of October 19, 2005 to disapprove SSA's recommendation for a presidential award of $32,819 to Mr. Cooley is VACATED. This matter is REMANDED to SSA for the agency to make determinations in accord with this Opinion and Order. SSA shall complete its determination within 180 days of the entry of this decision, and the decision on remand shall be filed with the Clerk as provided in RCFC 52.2(b)(3). In the interim, further proceedings before this court are stayed.

It is so ORDERED.